Okay, Mr. Ellison, we'll hear from you, representing Pinzoil-Quaker State Company. Ms. Ellison, I'm sorry. May I proceed? May it please the court. I'm Tracy Ellison, and along with my partner Kelly Keller, we represent Pinzoil-Quaker State in this trademark infringement matter. We are asking the court to reverse the lower court's finding of acquiescence and its injunction to the extent that the injunction allows a continued use of the trademark and trade dress. I'll address three of the grounds for that request today, or intend to. One basic question. One of the elements is prejudice, and that's maybe the weakest point of the case for the defendant, his failure to show prejudice in the doctrine of acquiescence. And the prejudice that they're showing is that, or alleging, is the restoration costs for the filling station and operation there that is just plastered with pinzoil everywhere, and they've got to take all of that down. And pinzoil could come in and give them $40,000 or take it down themselves and eliminate the prejudice. Any possibility. Why don't you do that? The case would be over. You'd win. Your Honor, the court certainly, I believe, that certainly would have been within the court's discretion to order. That is not what the court ordered, however. Well, it's in with you. The court didn't order you not to do it. You could surely have done that, and the case would be over. I just wondered why you didn't do it. $40,000, you're charging more than that for litigating this case this fall. That's correct, Your Honor. I would agree with that. The answer to that, unfortunately, there's no real evidence in the record of it. However, it was really not within pinzoil's purview to be able to go on to the private property and simply remove the trade dress. I believe had that been an opportunity, they would have done so. Because, I mean, on record, there's a lack of $40,000 is basically the cost, I think, that you offered them at one time to put up the signs. If they would put them up, you'd pay them $40,000, and you could just send them a check for $40,000 and now take it down. Right anyway. And, Your Honor, no, I believe my client would have been more than happy for that to have occurred. They simply were never given the authorization to do so. Okay. But specifically to the court's point, the appellee's weakest point, I agree, is the element of reliance and what is required for reliance and acquiescence is, I guess, most instructively looking at the Conan case and the Abraham case. And in the Conan case, the jury instruction that was tacitly approved by this court specifically said that in order to establish the element of reliance and acquiescence, for which it is an affirmative defense, by the way, and the defendants do carry the burden of proof, that the defendant must prove that it has built up a business around reliance on use of the trademark and trade dress. I don't think there's any doubt about that in the briefs that I've read, that they did do that. I mean, a Pennzoil decorated that place like it was a circus. I mean, Pennzoil everywhere. Your Honor, but in the case law, when you look at what is the reliance, what is the business investment, it's not just building up the case around it, but in Abraham, the court also said, the jury instruction was that the unlicensed user is unduly prejudiced when in reliance it makes major business investments or expansions upon use of the trademark. And therefore, to determine if a user is unduly prejudiced, you must consider what business investments and expansions the user of the trademarks made. And in this case, there is no evidence that the Appleys made any business investment or built a business around the trademark. Pit Stop USA was in the business of oil change and automotive inspection since 1992. They didn't build the business in reliance on the trademark and trade dress that was put in place in 2006. The business had long been standing. They didn't expand the business in any way. There's no evidence that they made any investment. They didn't open more shops. They didn't expand their shop. They didn't expand their offerings. I mean, that's basically your argument on appeal is that the fatal error of the district court was it found prejudice, which is a necessary element to establish the defense of doctrine of acquiescence. That is one of the grounds. Okay. That seems to me the strongest argument you've got. Now, tell me what you think is equally as strong. Equally strong. And one further point on that, it is not only a no evidence point, but it is also a point of a misapplication of law to the evidence because when you look at the findings of the court, the lower court, there are no findings of business investment or business expansion. So that's the reliance. That's just another way of stating prejudice. That's all you're doing is saying that the district court erred in a finding of prejudice based upon the expense of removal of the Pennzoil decorations. Correct, Your Honor. The only point I'm making is a no evidence is reviewable, findings of facts are reviewable based on a no evidence standard application of law to the facts where the conclusions of law are freely reviewable by the court. That was my only point. Another element of the affirmative defense of acquiescence is assurance. Like reliance, there is no evidence that there was an assurance by Pennzoil that the Appleys could continue utilizing the trademark and trade dress even if they sold counterfeit products and even if they utilized the trade dress to mislead consumers. Both of those activities were found to have occurred in this case. Yeah, but that's expanding the assurance element of the doctrine beyond what I would think they would need to show. Could Pennzoil have kept its mark and then allowed people to sell other product under its label? They were not, under that mark, they were not. If I understand the court's question, yes, the Appleys could continue selling other oil products even if they used Pennzoil trademark and trade dress. However, They didn't sell any Pennzoil product at all and they got Pennzoil everywhere. If I drive in there to get my oil change, I think I'm getting Pennzoil. They don't even sell Pennzoil. Isn't that a problem with that? There would be a problem with that. What's the problem? It would probably be infringement because it would be misleading the public what the source of product is. Yes, so my question is to protect their mark, I would think the duty to police your mark. You can't let somebody else use it and market the other product, right? You cannot allow someone to, I would agree you cannot allow someone to use it and knowingly allow them to use it knowing that they're not selling any of your product. That was not the case in this case, Your Honor. In this case, Pennzoil submitted a contract to the Appleys expecting it to be returned and it was not. But the injunction that you appeal in says that the injunction requires them to stop immediately unless Pitstop continues to promote and feature Pennzoil products, which they were doing, does not advertise or promote other major oil brands, which they were not doing, and purchases the product directly from Pennzoil's authorized distributor. So they weren't selling or advertising that they were selling any other oil other than Pennzoil, were they? Your Honor, while that part of the injunction addresses perhaps confusion regarding source of product, it does not address the confusion that still exists in the infringement that is ongoing regarding confusion regarding sponsorship and affiliation. There is no sponsorship or affiliation between Pennzoil and Pitstop USA at this point. That is clear. There is no question of that. And, again, instructive in Abraham. What I'm going to is really a friendly line of questioning. It's not clear to me how a court can order a company to continue to let somebody use their mark and selling a competitive product, for example, because they relied upon that use in the past. I mean, that just doesn't make sense. But that didn't happen here. No, the detriment that you found here, that they were relied upon what? Your Honor, if I'm following your question, if I may address it in this regard, with regard to the injunction itself in allowing someone to continue using the marks, the reason that is error is because in order, even if acquiescence were found, the court law is clear and stated very well in Abraham, very instructive in Abraham, is that where infringement has been found, and, of course, remember, it's an infringing use that's ongoing. There's a confusion that's going to be ongoing. You can only allow continued use in extreme situations, and those are situations where significant business investment would be lost if continuing use of the trademark and trade dress were allowed. In Abraham, even where they had invested millions of dollars in the business, rebuilt their business three times in reliance on utilizing the trademark-protected Greek symbols and letters and symbols, the court disallowed future use. Even in that case, it wasn't enough to allow future use of a future infringing use. In our case, there was, again, no evidence of any business investment that would be lost to Pitstop if they were not allowed to continue using the trademark and trade dress. There was not even any evidence of any, not just business investment loss, business loss itself. In fact, the evidence associated with that was a statement by Mr. Miller from a question from the court, was there any difference between your business before and after the re-imaging? Mr. Miller's response was no. There is no evidence. We still, as I understand your argument, it all comes back to the fact that the district court erred in finding any prejudice as a result of the reliance upon the earlier representations that had been made. That is correct, Your Honor. That's the argument. And that argument continues because the prejudice that's required has got to be sharp and demanding for the reason that the people are continuing to use your mark. That is correct, and there's really two components of it. At the level of the affirmative defense of acquiescence, the reliance component, there has to be evidence of business investment and business development around at the point, In order to prevent injunction issuing, however, there has to be an additional prejudice, an additional showing of loss of the business investment if it were not allowed to continue. That did not occur in this case, and the court's only finding in that regard, again, I'll go back to the court did not actually even enter a finding of either level of prejudice, either for the defense of acquiescence or the failure to enjoin future use. The court didn't find any, enter any finding of that prejudice. Instead, at one point it said it would be burdensome to remove. At another point it said they allowed their trade dress to be removed. Neither of those are findings of fact sufficient to support a finding of acquiescence or sufficient to allow infringing use to continue, and so we ask that they be reversed, both of those findings be reversed, both for a no evidence point and a misapplication of law to the facts. Let me add one question here. This is an injunction, and it is based, I suppose, on equity, and the district court has a lot of discretion as long as it operates within the law to fashion an injunction. So, I mean, how do you say the district court abused its discretion here other than to say that it misapprehended the requirement of prejudice in applying the doctrine of acquiescence? I mean, you clearly, the basis of the ruling is that you acquiesced in all of this, and you acquiesced in the continued use of these trademarks. But did the district court abuse its discretion if it had found some sort of prejudice other than the mere removal of the signage? It did abuse its discretion, Your Honor, and I could explain it best in the phrases that you used. They have discretion. The lower court has discretion to operate within the bounds of the law. That requires finding, having evidence of the elements of the affirmative defense and applying the law relating to the acquiescence to their findings of fact. And the lower court does not have, where there is no evidence of the elements of an affirmative defense, and when the findings themselves do not support a conclusion that an affirmative defense has been found, that is an abuse of discretion because the court did act beyond the bounds of the law. Okay. Well, thank you very much. And now we will hear from Mr. Boyd, representing Miller Oil Company. Yes, Your Honor. May it please the court. What we have here, and it's probably not very well stated in Appley's brief, we actually have three parts of the court's order. We have an absolute full injunction as to any unfettered use by Pitstop, use of the trademark without any limitation. Then we have a denial of the injunction for limited future use by Pitstop, which is essentially conditioned. If Pitstop complies with these conditions in the future, then the injunction is denied, and that's the acquiescence component. And then finally, when we get to dilution, they couple both of those with a limited injunction to avoid the dilution. So we actually have three component parts here. And the acquiescence is the one that somewhat our issue here is the reliance issue. But when you look at the Conan case, Conan says straight out, it says you either have reliance or you have substantial prejudice. Either or both of those meet the test for acquiescence. In this particular instance, there's really no question, and I don't think there's any dispute, that Pennzoil knew full and well of Pitstop's use of the mark. Pennzoil, in the words of the trial court, proposed it, they planned it, they funded it, and they performed it. They put their workers out there and made it happen. So I don't think that's in dispute. The court, in its opinion, says the act of doing that, of doing just that, is what the implicit and explicit assurances are. You bet you can use it. We're going to put it on your station and allow you to do that. That's the implicit assurance, and it's the explicit assurance as well. Obviously, they're not saying we're putting this up, but you can't use it. And the trial court was very, very specific on that. It's the logical flow. But they did it, they found it with a condition, and that condition, the evidence was clear. But the district court didn't make a finding that the defendants were prejudiced because of their reliance on Pennzoil's assurances. I'm sorry, Your Honor? I said the district court did not make a finding that the defendants were prejudiced because of their reliance on Pennzoil's assurances. That's correct, Your Honor. They simply made, the district court made the statement, Pitstop relied upon those insurances when they permitted the removal of their own trade dress. And that was what the court held. And when you look at the Conan case, which is the leading circuit case on the acquiescence issue, it specifically states that that third prong requires either reliance or substantial prejudice. No, no, no. And that's the way I would read the, in other words, the doctrine of assurance. Anyway, the doctrine relies on reliance. You have to show that you did rely on the representations that they made. The second is that you, that the reliance, the assurance was made, the doctrine of assurance, the assurance was made, reliance was made on the assurance, and the reliance was to the prejudice of the defendant. I think that we're actually all saying the same thing here. From my point of view, what you've got to show is whether the replacement cost or replacement of the signage will satisfy the requirement of prejudice under the doctrine of acquiescence. Your Honor, I think that the way we're looking at prejudice and the way the trial court looked at prejudice is looking back at the time the assurances were made, not at some subsequent point. And so the cost of removing They were just telling me what's your authority for that, that the district court, if that is the case, how the district court was following the law and making that assumption. Well, I believe in the district court actually recites it in its opinion. It's taken it straight out of Conan. It says, whether phrased as reliance or prejudice, the effect is the same. But there were substantial economic investments made in Conan. Economic investments, I thought. There were some, but I think that's merely evidence of the substantial prejudice. I don't think it is a requirement. It's not required in Conan. So you don't have to make any economic investment at all in your theory of I don't think that there I think in order to have substantial prejudice, the defendant actually has to do something it otherwise would have not done absent the plaintiff's conduct. And that could be substantial investment. In this case, what it was, it was the loss of the complete identity of the prior business. To the extent that there was an investment in that. No, but the whole thing is that they didn't lose any money by surrendering themselves to Pennzoil. No, but, Your Honor, what occurs If they didn't lose any money, there's no prejudice. They made money by surrendering themselves to Pennzoil. They lost their identity, Your Honor, as a kid. Did it cost them anything? No, they made money by losing their identity. There's no prejudice. That's the argument. And it sounds pretty good to me. I'm not sure what identity you would lose in the workplace if they're still making the money they were making before. It's not a welcome prejudice. I guess at this point, if you have a McDonald's that's been a long time established and it turns into a jack-in-the-box, there's no change in the entity. Because there's no change in the revenue. But it's obviously still something different. If you mean by change in identity simply the loss of the mark, then I don't know what your license, is there perpetual? Well, to the extent that Pitstop had an identity and in and of itself its own mark, it lost its mark and gained the Pennzoil mark. And if it were to be deprived of the Pennzoil mark, then it would have to go back to its mark. And the court was pretty clear that while— You had an opportunity to show that kind of prejudice. And you didn't show it. Well, I believe we did, Your Honor, in terms of the— You showed no economic loss, as I understand it. And if you did, you can tell me about it. Your Honor, we didn't quantify it in dollars and cents. Instead, what was done was through the testimony, it was demonstrated the difficulty of removing that trade dress. And I'm asking you to cite me one case, because they say there's none, that holds that prejudice can be satisfied by the cost of removing the signs as opposed to the loss of an investment, a business investment. Your Honor, I'll be honest with you. I'm unaware in the limited acquiescence cases— restoring the place's prejudice, then the district court did err. Well, but, Your Honor, in Conant's, we don't have a substantial investment question either. We don't have dollars and cents quantified in Conant. I think they did. I think in Conant, they had the whole restaurant. The individual had put all of his money into this one restaurant. So he had a huge investment under the mark of Conant or whatever the mark was. And then Conant came and had his picture taken with these people and, you know, was saying you're doing a great job here. And then that was the basis for the defense of the doctrine of— Perhaps what I read into Conant was not the dollars invested, but the fact that they ran Conant for eight years just like Pitstop ran for its number of years, building up a goodwill under that mark based on the assurances in reliance. So I thought the evidence showed that the Pennzoil's concern was that this place, Pitstop, was branded as Pennzoil. All the images went with that. And if I wanted to get my truck oil changed, I wouldn't necessarily get Pennzoil. They would substitute cheap stuff in there. So, you know, this is a reliance upon the— So if I'm the selling product under the image of Pennzoil and it's not Pennzoil, and then they come back and Pennzoil said you can't do that, then I have relied to my detriment. My identity has been lost. It's an extraordinary identity that you're using their oil. By their allegations, you're using their images to sell cheaper oil and making more money. The trial court specifically found in its findings, in fact, that Pitstop actually made more profit off of the Pennzoil, but more importantly that Pennzoil was constantly being upsold and featured by Pitstop. It was not—they offered—Pitstop offered a generic alternative for those who did not want— I'm just picking up—and maybe I have the facts all wrong. I've not read the record that carefully for sure. But as I read through the papers here, the thing that precipitated this dispute was that your client was not overselling Pennzoil products. It was because they're selling other products as Pennzoil products. There was an allegation that, Your Honor, in what occurred, Pitstop was purchasing from who they thought was an authorized Pennzoil distributor. There was an anonymous complaint apparently made to Pennzoil. At that point, Pennzoil noticed them saying we don't think you're selling Pennzoil product. The minute they found out about that complaint, they pulled every bit of it out of the shop.  Excuse me. What were they pulling out of the shop when the complaint came? Oil that they had purchased in Pennzoil barrels from Latch Oil Company in East Texas. What I'm saying to you—what you're telling me is that they were doing exactly that. They were selling—why would you pull out this other oil that— Solely based on the allegation they did not want to be in a situation where the product wasn't as it was stated. They had no reason to believe that it wasn't Pennzoil other than Pennzoil's own allegation that there were insufficient chemical tracers. Pitstop has no way of physically testing the oil. I just didn't follow what you just said. I thought you said on a complaint of Pennzoil, some anonymous whatever, and Pennzoil brought it to their attention. Then they pulled out oil, drums of oil. And I don't think you were telling me that they were pulling out Pennzoil oil. They were pulling out the oil—they were doing exactly what the anonymous tipster said they were doing. No, Your Honor, they were pulling out oil that they had purchased from Latch in Pennzoil packaging that had been represented to them as Pennzoil by Latch because— Are you telling me that the oil that you were throwing out had Pennzoil's label stamped on it? Yes, Your Honor. But it wasn't Pennzoil oil. But it wasn't Pennzoil oil. According to Pennzoil, it was not Pennzoil oil. The problem is that there's no way for someone like Pitstop to test the tracers because they won't provide the data. Not only that, there are no lab facilities. But the mere allegation was enough to say, let's pull it out of the tank. Let's keep the barrels that are marked Pennzoil that we acquired from Latch and put them over to the side. And it was found out through this lawsuit, and immediately a third-party complaint was filed against Latch for selling counterfeit oil and selling it to Pitstop as Pennzoil in Pennzoil barrels. All right, let me ask, can you sum up what your position is? One, two, three, four. In other words, why should we affirm the district court? The re-imaging was complete. It was substantial. As Judge Hittner said, it was all over the place. And as a consequence, Pitstop, which had a red, white, and blue identity that had been in business for many, many years, ceased to exist and became Pennzoil's stationary billboard on a major thoroughfare. And they went from being an obviously independent retailer to a Pennzoil facility. They could have simply gone in. Pitstop could have gone in and repainted their building and put on their awnings and maintained their own colors. You're not making any points right there. Let me reduce this thing to its essence, to your position, to its essence. Why is the district court correct? As I understand it, the district court—the basic reason they are arguing that the district court is incorrect is that you made no investment, that there was no prejudice that resulted from their acquiescence to use their product and their signage. Now, why is that wrong? That is wrong, Your Honor, because there is nevertheless a prejudice as a loss of the Pitstop identity, which the district court took into account, and that there is not necessarily a requirement that that be quantified, if it could be quantified, in dollars and cents. Okay. That's your argument. That's it. You've laid it out there. Thank you very much. The Pennzoil Quaker attorney argued that acquiescence would be a defense to damages for infringement, past damages, but it does not allow the court to have the discretion to, or in perpetuity, that Pitstop can use Pennzoil's trademarks under certain conditions. What's your response to that? That's not what the district court actually did. What the district court did is it fashioned an equitable result, and it said, you were provided assurances that you could use this if you meet these various conditions, namely, you buy from an authorized distributor, you feature Pennzoil products, and you do not carry another major brand. And provided they did that, then they're entitled to use the Pennzoil logo, which Pennzoil put all over their building. And they further ordered, the district court further ordered, that you could not continue to use the Pennzoil signage once this signage wore out. You could not replace it with new signage. That's right. So you could not, as soon as they got rid of this signage, you could no longer use their trademark. That's what they said. That's correct, Your Honor. I think it actually implies something even further than that. It says, to me, Judge Hittner's order says, and not only that, you can't go out and build another Pitstop and put Pennzoil signage. You're enjoined and restrained from future erection of any exterior signage. I thought the evidence was these signs last 25 years. I thought the evidence from your witness was that he expected the signs to last 25 years. I want to say between 10 to 25, Your Honor, depending on the material. Your witness said he expected these Pennzoil signs, the new ones, to last 25 years. That's correct, Your Honor. Pennzoil. I guess if Quaker put up all their signage, if somebody wants to sell their product and they put all their signage up, it's good for at least 25 years. Because to take it otherwise would destroy their identity. And so it's not a perpetual mark. It's just for the lifetime of an ordinary person. That's correct. It's not a perpetual. It's for the life of the signage. If the signage lasts 25 years, fine. If it lasts 10 years, fine. They can't put new signage up. Nor can they erect a new building and use the same signage. But they're allowed to use the signage without any kind of contract for a substantial period of time. They are allowed only if they feature Pennzoil. Right. Under those conditions. But there doesn't have to be. There's no contractual. No, there's no contract. And there was no contract in place when Pennzoil put all the signage on the property. That contract had expired. And Pennzoil was aware that it had expired. A prenup wouldn't have done any good under this ruling. You know, it's a funny thing about a divorce situation. I guess one of the spouses may lose their identity, but I don't know that that means that you have to continue the relationship for 10, 25 years. But it strikes me as an oddity of the way this has been applied as a trademark law. And franchising. So be it. If I could address that. I think the entire point of the trademark is that there is an intrinsic value in every trademark, whether it be the Pit Stop trademark. Is there any sponsorship or affiliation going forward? Well, to the extent that Pit Stop is only purchasing Pennzoil product from Pennzoil authorized dealers. But it's totally up to Pit Stop. It's sole whim. It's sole choice. Well, within the context of the injunction. Can Pennzoil stop selling Pennzoil oil to Pit Stop tomorrow? That's an antitrust question. I don't know the answer to. I would assume as under contract law, I'd assume yes. I don't know why they couldn't. Okay, Mr. Boyd. Thank you very much. And we will move to rebuttal now by Ms. Ellison. If you think you need rebuttal, you have five minutes. Two specific points in rebuttal. First, the evidence was that the oil product that was purchased by the investigator in 2010 was not Pennzoil oil product. The evidence also was undisputed, was it not, that Pit Stop did buy from an authorized dealer. The oil did come in Pennzoil barrels. So Pit Stop did not know. There's no evidence that I saw that Pit Stop knew it was buying anything other than Pennzoil oil. Latch was not an authorized distributor. The authorized distributor that Pit Stop should have been purchasing from and was purchasing some amounts from at that time was Oil Patch. Latch was not an authorized Pennzoil distributor. I assume that they weren't paying the same price for that oil that they were paying up Pennzoil for it or they wouldn't have been buying it either. One could surmise in that area, Your Honor, and we would just make the point whether it was intentional or inadvertent through lack of quality control, it doesn't change the fact that a counterfeit product was sold to the public. That's undisputed. The other point in rebuttal is the evidence does not support nor did the lower court find that Pit Stop completely lost its identity. Pit Stop began as an oil change and automotive inspection business in 1992. It continued doing business as Pit Stop USA. In the re-imaging, it is still prominently displayed. Pit Stop USA is still prominently displayed on the facade of the building. The invoices at Pit Stop, this is all in the record, the invoices at the location prominently display Pit Stop USA. They even have T-shirts made that have the emblem Pit Stop USA. They continue today to do business as Pit Stop USA. They did not lose their identity. The court didn't find that they lost their identity. Even if it had, it still doesn't rise to a business investment or development of a business around dependence and reliance on use of the trademark as is required, as this court has pointed out, in Conan and Abraham. In Conan, they built four additional restaurants in reliance on utilization of the name Conan's Pizza, four additional businesses. That is developing business around the belief and assurance it could call their businesses Conan's Pizza. That is the kind of business investment that has to be shown by the appellees to establish the element of acquiescence. In Abraham, the element, and although that was a laches case, let me be clear, the court said the inquiry regarding reliance is the same or similar. In that case, Abraham spent millions of dollars rebuilding its business three times in reliance on utilizing the trademark symbols. Interestingly, in that case, the trademark protection for those symbols came after Mr. Abraham had begun his use and had utilized them for years. Finally, Your Honors, I would just reiterate our request that this court reverse the lower court's finding of acquiescence. First, because there is no evidence of the elements of assurance or reliance necessary for a finding of acquiescence. Secondly, the actual findings of the court in those areas are insufficient to support a conclusion that acquiescence was established. Finally, Your Honor, we'd like to either vacate the injunction or remand the injunction with instruction that an injunction prohibiting all future use issue immediately because there is no evidence of loss of future business at all of appellee if they're not allowed to continue utilizing the trademark and trade dress again in an infringing matter. There is no sponsorship or affiliation between these parties at this time.